OPINION
Defendant-Appellant Michael N. Nelms is appealing his conviction of two counts of felony theft. Nelms has asserted six assignments of error. We have reviewed the record with respect to each of Nelms' claims, and hereby affirm the judgment of the trial court.
On September 29, 1998, Nelms was charged by indictment with two counts of theft by deception in violation of R.C.2913.02(A)(3). A jury trial was held on January 4 through 6, 1999, wherein Nelms was found guilty of both counts.
The record reveals that on September 3, 1998, at approximately 2:30 p.m., Nelms walked into Ohio Loan Company, a pawn shop where customers can obtain a short-term loan in exchange for personal merchandise. He approached the clerk, James T. Snell, about a loan in exchange for pawning three gold chains and a crucifix. Ervin Watson also entered the shop at approximately the same time. Although he had not received any formal training in jewelry appraising, Snell had fifteen years of experience and on-the-job training in testing and evaluating the authenticity of jewelry. Snell conducted an acid test on the pieces because the chains were tarnished and Snell had not been able to confirm by sight that the gold was authentic. Snell discovered that the pieces were fourteen carat gold. After weighing the jewelry at two hundred and fifty grams, Snell determined that he would loan $750 to Nelms, to which Nelms agreed. Snell began to write out the pawn ticket for that amount. Upon Snell's request for a drivers' license, Nelms produced a Georgia drivers' license in the name of John P. Davis.
At that point, Watson approached the counter and advised Nelms that he could receive more money for his jewelry at the pawn shop down the street. Nelms stopped the transaction and retrieved the jewelry from the counter. Watson then handed Snell some coins and asked Snell for a loan, to which Snell informed Watson that Ohio Loan Company did not deal in coins. At that point Nelms, who had remained at the counter, placed the jewelry back onto the counter and told Snell that he wished to resume the transaction. Snell took the chains and the crucifix, which appeared to be the same ones he had previously tested and weighed, and completed the pawn ticket for the $750 loan. Nelms signed the ticket as John P. Davis, accepted the money, and left the store.
At approximately 3:30 p.m. on that same day, Nelms and Watson drove one half mile to Cash To Go pawn shop. This time, Watson approached Arthur Artis to inquire about obtaining a loan for approximately $750-800 in exchange for pawning three gold chains and a crucifix. Artis, a store clerk who had made it a practice to deal with transactions of $250 or below, referred Watson to the manager of the shop, Ilya Golub. Golub, a native of Ukraine, had no formal training in jewelry appraising, however, he had become skilled through three years of on-the-job training. Golub acid-tested the jewelry and confirmed that the jewelry was authentic fourteen carat gold. Upon weighing the gold at two hundred forty-eight grams, Golub offered to loan $750 to Watson. While Artis completed the pawn ticket he had requested identification from Watson, who had produced a Georgia drivers' license which identified him as "Dennis Black." During this process, Artis had noticed that Watson's keys, which he had placed on the counter, were attached to a rental car tag.
At this point, while Golub still had possession of the jewelry, Nelms began arguing with Watson about whether they could have obtained more money at Ohio Loan Company. Watson began arguing with both Golub and Nelms about the money, and Golub, who had become anxious with the fighting that had erupted around him, retrieved the necklaces from the scale, exchanged them in return for the $750, and told the men to leave. Nelms left the shop, but Watson remained and continued to argue with Golub. Nelms re-entered the shop, and Watson decided to resume the transaction. Watson placed the jewelry on the counter, Golub produced the money, Watson signed the ticket, and Watson and Nelms quickly left the shop.
Almost immediately, Golub realized that the jewelry on the counter was not of the same quality and authenticity as the jewelry which he had previously evaluated. The necklaces were too shiny, and upon re-weighing them, he found that they weighed approximately one hundred seventy grams. Golub called the police and sent Artis to search for the two men who had deceived him.
Artis, who was unsuccessful at overtaking the men, returned to the shop. Shortly thereafter, Artis and Golub watched Watson re-enter the shop to retrieve his identification and his wallet which he had left on the counter. Golub told him that he would not be getting his money back because he gave him "fake gold," to which Watson threw the wad of money back onto the counter and begged Golub not to call the police. Golub reached for his handgun, activated the front door's automatic lock, and detained Watson at gunpoint until the police arrived almost ten minutes later.
During Artis' search for the men, he had stopped by Ohio Loan Company and alerted them to the deception which had been perpetrated upon them. Snell and his manager, Richard J. Blum, retrieved the three chains and crucifix from the vault, and re-examined and re-weighed the jewelry. They quickly concluded that the items were not authentic and they were not the same items which Snell had previously tested and weighed.
In response to Golub's call, Montgomery County Sheriff's Office Detective Gregory A. Laravie was dispatched to Cash To Go on a reported robbery. The dispatch indicated that the suspects were two black males and that one had been detained inside the shop. As he approached, Det. Laravie noticed a small green Mazda parked just one business north of the shop, and on the same side of the street. The car was occupied by one black male, Nelms, who appeared to be watching the pawn shop. Upon Det. Laravie's arrival, Nelms drove the Mazda from the lot and headed north onto Salem Avenue. Det. Laravie proceeded into the shop after he radioed for another officer to stop the Mazda. Watson was arrested and $1400 was found in his pockets.
Deputy Sheriff Mark Worley heard Det. Laravie's broadcast and saw the described green Mazda pull out from the side street where the shop was located and onto Salem Avenue. He quickly followed in behind the Mazda and stopped the vehicle at a nearby Burger King. He ordered Nelms out from the car and performed a routine pat down, during which he discovered $1226 on Nelms. Deputy Worley radioed for an evidence technician to assist and search the car after he had observed a large amount of jewelry on the floorboards of the car. Deputy Richard E. Winkler responded to the dispatch to assist Deputy Worley.
Within the hour, Artis was brought to the Burger King parking lot to confirm that Nelms was one of the men who had participated in the deceptive "switch." Upon this positive identification, Deputy Worley received approval to arrest Nelms and book him into the Montgomery County Jail.
Later, Det. Laravie confirmed that the Mazda which Deputy Worley stopped was the car he originally had observed pull out of the Cash To Go parking lot. Additionally, Watson had told the officers at Cash To Go that the vehicle he had occupied was a rental car, and Deputy Worley noted that attached to the ignition key of the Mazda was a plastic tag indicating that the car was an Avis rental car.
Deputy Winkler photographed the scene and inventoried the vehicle's contents. He discovered more than sixty-five gold necklaces, ten loose gold crucifixes, nine Rolex watches, a Movado watch, several rings, pendants and bracelets, and fourteen carat gold testing solution. Deputy Winkler was unable to obtain a good set of fingerprints from the boxes or the jewelry, but he and Hoyt Baumgardner, a fingerprint processor at Miami Valley Regional Crime Lab, testified that it is extremely difficult to obtain fingerprints from jewelry because prints are easily wiped from the nonporous metal and because there is not adequate surface area in which to retain a print.
The next day, on September 4, 1998, Det. Thomas D. Wolfe and Deputy Winkler arrived at Busy Bee Towing to inventory the remaining items in the car before they returned the car to the rental agency. They discovered another box of jewelry under the driver's seat and more jewelry in the two suitcases in the trunk, consisting of nine gold necklaces, five gold rings, a silver Rolex watch, and a panther pendant.
The numerous items discovered in the car were subsequently tested by Richard J. Blum, the manager of Ohio Loan Company, at the request of the prosecutor's office. It was discovered that the jewelry was a mixture of authentic and fake pieces. The majority of the necklaces and chains were brass, the Rolexes were inexpensive replicas, however, some of the pendants were gold and the Movado watch was authentic.
On January 6, 1999, Nelms filed a request for jury instructions which included a request for an instruction on the pawn clerks' identification testimonies as in United States v.Telfaire (C.A.D.C. 1972), 469 F.2d 552, 558-559. The trial court overruled this request on the record, stating that the identifications were neither delayed nor in the form of a line up or a show up, thus a Telfaire instruction was not necessary.
Nelms was convicted of both counts of theft, and was sentenced on January 20, 1999 to community control for a term of five years. This appeal timely follows.
 I., Appellant's right to due process of law, as guaranteed by the United States and Ohio constitutions, was denied when he was convicted of violating Ohio Revised Code Section 29113.02(A)(3) on evidence insufficient as a matter of law to sustain the conviction.
Nelms argues that the sufficiency of the evidence does not support his criminal convictions, specifically, that the State failed to prove that Nelms acted purposely and knowingly. Nelms argues that he was a mere witness to the transaction, and that it was Watson who had committed the crimes. Nelms further argues that "mere possession" of the jewelry in the Mazda does not prove the necessary culpability of the crimes for which he was convicted, but instead that Nelms was guilty of "constructive possession," by simply having been present in the Mazda with the items. We do not agree.
Sufficiency of the evidence is a question of law which tests the adequacy of the evidence. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In considering a claim of sufficiency of the evidence, a reviewing court:
 [E]xamine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Additionally, because the trier of fact is in a better position to observe the witnesses' demeanor, gestures and voice inflection, the weight of the evidence and credibility issues are best resolved by the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus, 39 Ohio Op.2d 366, 367.
The theft statute, R.C. 2913.02(A) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." After reviewing the record, we conclude that there was sufficient evidence upon which to conclude that all the elements of theft under R.C. 2913.02(A)(3) had been proven beyond a reasonable doubt.
The record reveals that on September 3, 1998 at two different pawn shops, Ohio Loan Company and Cash To Go, Nelms and Watson played out the same scenario, however they alternated roles. The men entered the shops, one of them approached the clerk and inquired about a loan in return for pawning three gold chains and a gold crucifix. The chains were tested, determined to be authentic, weighed, and an appraisal value was given. In both instances, a loan amount of $750 was agreed upon by the clerk and either Nelms or Watson. Shortly after the agreement was made, a diversion was created, resulting in the temporary withdrawing and canceling of the pawn transaction by either Nelms or Watson. In both instances, Nelms or Watson quickly "changed their mind," reproduced the jewelry and proceeded with the transaction, leaving the shop with $750. In both instances, it was determined that the jewelry finally acquired by the shops in return for the loans was not the same jewelry each shop had originally evaluated and determined to be authentic.
Under the facts in this case, it was not unreasonable for the jury to determine that Nelms acted with purpose to deprive the owners of the shops of their money, and that he knowingly obtained the money by deception. The two series of events are identical, demonstrating Nelms' and Watson's scheme to purposely deceive the shops. In both instances, a loan was obtained by using authentic fourteen carat gold jewelry, and prior to the completion of the transaction, one of the men switched the authentic gold jewelry for brass costume jewelry. It was clear that the men had no intent to repay the pawn loan, as evidenced by the fact that neither Nelms nor Watson used their own identification. Nelms and Watson wanted to leave no trail in the event the owners realized that the jewelry was not real gold. Thus, after reviewing the record and viewing the evidence in a light most favorable to the prosecution, the jury could have found that the essential elements of theft, including Nelms' purpose to commit the deceptive deprivation, were proven beyond a reasonable doubt.
Nelms' first assignment of error is overruled.
II.
 The court abused its discretion in refusing to give the Telfaire eyewitness identification instruction to the jury.
Nelms claims error in the trial court's failure to instruct the jury on the potential unreliability of the eyewitnesses' identification testimonies. Nelms claims that the eyewitnesses from both shops were unreliable, because "there is no evidence that witnesses had ever seen or that they knew Nelms," and because the clerks had only viewed the suspect for a short time, during which distractions had been occurring in the shops. Additionally, Nelms claims that the circumstances under which Artis had identified Nelms as a suspect in the Burger King parking lot was suggestive because Nelms was the only possible suspect from which Artis could choose when he made his identification. As a result, Nelms argues that the trial court abused its discretion by not having included a special instruction pursuant to United States v.Telfaire (C.A.D.C. 1972), 469 F.2d 552.
We disagree, and hereby find that the trial court's instruction to the jury regarding credibility of witnesses and their testimonies was more than adequate on the facts of this case. The court in Telfaire, supra, promulgated a model instruction to caution the jury of the potential unreliability of eyewitness testimony. The Ohio version of a Telfaire instruction under 4 Ohio Jury Instructions (1997), 41, Section 405.20(5), lists several factors that the jury "may consider" in weighing identification testimony of witnesses:
 1. Capacity of the witness, that is, the (age) (intelligence) (defective senses, if any,) and the opportunity of the witness to observe.
 2. The witness' degree of attention at the time he observed the offender.
 3. The accuracy of witness' prior description (or identification, if any).
 4. Whether witness had had occasion to observe defendant in the past.
 5. The interval of time between the event and the identification.
 6. All surrounding circumstances under which witness has identified defendant (including deficiencies, if any, in lineup, photo display or one-on-one).
However, "[t]he decision of whether to give a Telfaire instruction is a matter within the sound discretion of the trial court that depends `in large measure on whether a resolution by the jury of the disputed issues in the case requires or will be clearly assisted by the instruction.'" State v. Blackburn (Aug. 28, 1998), Greene App. No. 97 CA 100, unreported, quoting State v. Guster
(1981), 66 Ohio St.2d 266, 271, 20 Ohio Op.3d 249, 252. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173.
In Blackburn, the victim of an abduction and gross sexual imposition identified the defendant from a photographic lineup one month after the incident. We upheld the trial court's determination that a Telfaire instruction was not necessary, even though the encounter lasted "just a matter of seconds," because the victim had an opportunity to observe the defendant at close proximity and the victim's description of her assailant closely matched that of the defendant. Id. The trial court's instructions to the jury on its role as the sole judge of the facts, witness credibility, and weight of the evidence had been appropriate in Blackburn without a Telfaire instruction, because the eyewitness testimony was reliable, and such an instruction would not have changed the outcome at trial.
Upon review of the entire record of the proceedings below, we find no abuse of discretion in the trial court's failure to give aTelfaire instruction. During cross-examination of the clerks from Cash To Go and Ohio Loan Company, defense counsel performed extensive questioning regarding their opportunities to view the suspect. Defense counsel again raised the question of the credibility of Snell's identification during closing arguments, alerting the jury again to the fact that the suspect was only in Ohio Loan Company for a minute and a half in Snell's presence, yet he had positively identified Nelms as the suspect. Additionally, the trial court did generally instruct the jury on credibility issues, stating in pertinent part:
 You are the sole judges of the facts, the credibility of witnesses, and the weight of the evidence. To weigh the evidence, you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives.
 These tests include the appearance of each witness upon the Stand; his or her manner of testifying; the reasonableness of the testimony; the opportunity he or she had to see, hear and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence; interest and bias; together with all the facts and circumstances surrounding the testimony. Applying these facts, you will assign to the testimony of each witness such weight as you deem proper.
(Tr. 445-446)
The eyewitnesses identified Nelms as the suspect after working with him for several minutes, face to face, and in broad daylight. Very soon after interacting with Nelms in Cash To Go, Artis identified Nelms as the suspect. As in Blackburn, we find that the trial court reasonably determined that the jury did not need the Telfaire instruction to resolve the factual issue of the identification of Nelms as one of the men who had tried to swindle Cash To Go and Ohio Loan Company. We also find that had the jury received a Telfaire instruction, the outcome at trial would not have changed. Thus, it was not an abuse of discretion for the trial court to deny Nelms' request that a Telfaire instruction be given to the jury.
Accordingly, we overrule Nelms' second assignment of error.
III.
 The Appellant was denied a fair and impartial trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution through prosecutorial misconduct.
Nelms claims error in Det. Wolfe's reference to six allegedly fake credit card receipts for the purchase of watches. Defense counsel had objected and moved for a mistrial. The trial court overruled the motion, but struck Det. Wolfe's answer from the record. The prosecutor later referenced the receipts in her closing argument, which was met with objection from defense counsel. The trial court overruled the objection and did not provide a corrective instruction. Nelms argues that he was prejudiced by the remarks.
In considering claims of prosecutorial misconduct, an appellate court must examine whether the prosecutor's conduct at trial was improper, and if so, whether this conduct affected the defendant's substantial rights. State v. Lott (1990), 51 Ohio St.3d 160,165. The analysis centers on the fairness of the trial, not the culpability of the prosecutor, in determining whether the prosecutor's conduct is grounds for error. State v. Apanovitch
(1987), 33 Ohio St.3d 19, 24; State v. Maurer (1984), 15 Ohio St.3d 239
. Error exists if it is clear beyond a reasonable doubt that the jury would not have found the accused guilty absent the prosecutor's comments. State v. Smith (1984), 14 Ohio St.3d 13,15; State v. Benge (1996), 75 Ohio St.3d 136, 141.
Generally, prosecutors are entitled to a significant degree of latitude and freedom of expression during closing arguments.State v. Brown (1988), 38 Ohio St.3d 305; Apanovitch, supra, at 19; Maurer, supra, at 267. It is well-established that statements made by counsel during closing arguments are not evidence. Statev. Frazier (1995), 73 Ohio St.3d 323, 338. Furthermore, the closing argument must be viewed in its entirety to determine whether the prosecutor's remarks were prejudicial. State v.Moritz (1989), 63 Ohio St.2d 150, 157, 17 Ohio Op.3d 92, 17 Ohio Op.3d 92, 96-97. Suspect statements made during closing arguments are not grounds for reversal unless the conduct resulted in such prejudice that the defendant received an unfair verdict as a result of those comments. Apanovitch, supra, at 24.
In this case, the prosecutor did make reference during closing arguments to the fake credit card receipts which had not been admitted into evidence. The entire reference at issue is as follows:
 Look at the evidence you find back in there. Look at the watches and the credit card receipts that were with those watches.
 You'll notice another thing too. All those credit card receipts came from the same store on two different days. There's quite a few receipts — only two days are marked on `em at the exact time. So they purchased all these watches. It's another thing you can . . .
Mr. Arntz: Objection . . .
Ms. Hiett: . . . make an inference from.
 Mr. Arntz: . . . there's no evidence — excuse me — there's no evidence of that.
Judge Brown: Overruled, it's argument.
Ms. Hiett: It's another thing you can make inferences from.
(Tr. 439-440.) However, the next day, during the trial court's charge to the jury, the trial court instructed that closing arguments were not evidence, and also instructed that "[s]tatements and answers that were stricken by the Court in which you were instructed to disregard are not in evidence and must be * * * treated as though you had never heard them." (Tr. 445)
Accordingly, we cannot find that Nelms was denied a fair trial. Although the statements at issue were not proper, they were briefly made and somewhat vague. Taken in view of the entire closing argument, the remarks did not prejudice Nelms. Moreover, we conclude that Nelms would have been found guilty regardless of the alleged prosecutorial misconduct, as there was sufficient evidence to convict Nelms even if the comments in question had not been made. Therefore, we find that even if the reference itself was inappropriate, it was not so prejudicial as to deny Nelms a fair trial. Nelms' third assignment of error is not well taken.
IV.
 The court prejudiced Appellant's constitutional right to a fair trial through its improper admission of hearsay evidence.
Nelms assigns error to the trial court's admission of the six fake credit card receipts, resulting in his denial of a fair trial. However, in reviewing the record, the prosecutor withdrew the receipts from the court's consideration prior to their admission into evidence. Accordingly, Nelms' fourth assignment of error is meritless.
V.
 The court erred to Defendant's prejudice through permitting the admission of confusing, misleading and prejudicial testimony over objection.
In his fifth assignment of error, Nelms claims error in several of the prosecutor's questions to Ilya Golub for having been "misleading" and "confusing." Specifically, the prosecutor did not have Golub clarify at one point whether it was Watson or Nelms who had engaged in the conduct to which Golub had been testifying, and this "tended to reinforce in [the juror's] minds the suggestion that Nelms had committed certain acts which were in act {sic} performed by Watson." Nelms argues that these questions made Golub's testimony even more confusing and hard to understand.
While we agree that Golub's testimony was somewhat confusing at times, "[t]he issue of whether testimony or evidence is relevant or irrelevant, confusing or misleading, is best decided by the trial judge, who is in a significantly better position to analyze the impact of the evidence on the jury." Renfro v. Black
(1990), 52 Ohio St.3d 27, 31. (Citations omitted.) Accordingly, a trial court has broad discretion in the admission or exclusion of evidence and testimony, and reviewing courts will be slow to interfere unless the trial court has clearly abused its discretion, and the party is materially prejudiced. Maurer,supra, at 265.
In reviewing Golub's testimony as a whole, we do not find it misleading or detrimentally confusing. Furthermore, defense counsel initially objected to Golub's testimony on the basis which Nelms now claims as error. The trial court overruled the objection and stated that Nelms would have an opportunity to cross-examine Golub. However, upon cross-examination, defense counsel conducted a very brief questioning of Golub about "Dennis Black's" drivers' license and also what denominations were paid to Watson in exchange for the loan of the gold jewelry. Nelms failed to seek clarification for this "confusing" testimony, indicating to us that Golub's testimony as a whole was not as confusing as he now claims.
Although Golub struggled with the English language somewhat during his testimony, his overall story was clear. We find that the trial court's strategy in allowing Golub to testify to the events and, if necessary, provide Nelms with the opportunity to "clarify" any "confusion" during cross-examination was within the trial court's discretion and did not materially prejudice Nelms. As such, his fifth assignment of error is overruled.
 VI. Errors occurring throughout these proceedings constitute cumulative error such that the convictions must be reversed.
In his final assignment of error, Nelms argues that the cumulative effect of all errors made at trial deprived him of a fair trial and warrants a reversal. "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." State v. Fears (1999),86 Ohio St.3d 329, 348. However, this doctrine is not applicable in instances where there is an absence of harmless and prejudicial error. State v. Garner (1995), 74 Ohio St.3d 49, 64; State v.Blankenship (1995), 102 Ohio App.3d 534, 557.
In the preceding five assignments of error, Nelms claimed error in several facets of his trial. However, we find that Nelms did receive a fair trial, and any errors that did occur at trial were not prejudicial, cumulatively as well as individually. Nelms' sixth assignment of error is overruled.
As such, we affirm the judgment of the trial court.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Todd T. Duwel, Matthew Ryan Arntz, HON. ROBERT M. BROWN